**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARK B.[1], ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 22-cv-1080 (GMH) |
| ) | |
| MARTIN O'MALLEY, ) | |
| Commissioner of Social Security,[2] ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OPINION**

Plaintiff Mark B. filed this action seeking to reverse the decision of the Commissioner of Social Security, Martin O'Malley ("Defendant" or "the Commissioner"), denying his application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. § 405(g). Plaintiff alleges that the Administrative Law Judge ("ALJ") who held a hearing and issued an opinion at the administrative level improperly assessed his Residual Functional Capacity ("RFC") by failing to include an accommodation for his absenteeism due to court-ordered mental health treatment; erroneously discounting the opinion of Plaintiff's treating psychiatrist that Plaintiff would regularly be absent from work and frequently off-task when he was at work; and inadequately addressing lay opinion testimony from Plaintiff's mother. He also asserts that the ALJ insufficiently accounted for Plaintiff's limitations in his questioning of the vocational

---

[1] Plaintiff's name has been partially redacted in accordance with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt. to Chief Judges of the U.S. Cts. of Appeals, Chief Judges of the U.S. Dist. Cts., Clerks of the U.S. Cts. of Appeals, and Clerks of the U.S. Dist. Cts. (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf [https://perma.cc/N9T2-U5XG].

[2] Martin O'Malley, Commissioner of Social Security, is substituted for Kilolo Kijakazi pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

expert ("VE") at the hearing, rendering the ultimate determination that Plaintiff was not disabled fatally flawed. He seeks a remand to the Social Security Administration ("SSA") for calculation of benefits or, in the alternative, for further administrative proceedings. Upon consideration of the parties' briefs and the administrative record,[3] Plaintiff's motion for judgment of reversal will be granted to the extent that it requests remand to the SSA for further administrative proceedings, and Defendant's motion for judgment of affirmance will be denied.

## I.    BACKGROUND

### A.    Statutory and Regulatory Framework

To be eligible for SSI benefits under the Social Security Act, the SSA must find a claimant to be "disabled," meaning that the individual is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). To make that determination, an ALJ gathers evidence, holds a hearing, takes testimony, and performs the following five-step, sequential inquiry of the disability claim:

Step one:  whether the claimant is engaging in "substantial gainful activity";[4]

---

[3] The relevant docket entries for purposes of this Memorandum Opinion are: (1) the administrative record ("AR"), ECF Nos. 8–9; (2) Plaintiff's motion for judgment of reversal, ECF No. 22; (3) Defendant's motion for judgment of affirmance and opposition to Plaintiff's motion for judgment of reversal, ECF Nos. 24–25; and (4) Plaintiff's opposition to Defendant's motion for judgment of affirmance and reply to Defendant's opposition, ECF Nos. 26–27. The page numbers cited herein are those assigned by the Court's CM/ECF system.

[4] "Substantial gainful activity" is work that "involves doing significant and productive physical or mental duties" and is "done (or intended) for pay or profit." 20 C.F.R. § 416.910; *see also* 20 C.F.R. § 404.1510 (defining "substantial gainful activity" for the purposes of Social Security disability insurance benefits ("DIB") claims). "If [the claimant is] doing substantial gainful activity, [the Social Security Administration] will find that [the claimant is] not disabled." 20 C.F.R. § 416.920(a)(4)(i); *see also* 20 C.F.R. § 404.1520(a)(4)(i) (defining the step one inquiry for DIB claims).

2

Step two:  whether the claimant has a "severe" medically-determinable physical or mental impairment or combination of impairments;[5]

Step three:  whether the claimant's impairment is equivalent to one of the disabling impairments listed in the appendix of the relevant regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "listings");

After step three, the ALJ determines the claimant's residual functional capacity—i.e., the most he or she is able to do notwithstanding his or her physical and mental limitations;

Step four:  whether the impairment prevents the claimant from performing his or her past relevant work;[6] and

Step five:  whether the claimant, in light of his or her age, education, work experience, and RFC, is unable to perform another job available in the national economy.[7]

*See* 20 C.F.R. § 416.920; *see also* 20 C.F.R. § 404.1520 (outlining the five-step sequential inquiry for DIB claims); *Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004).  "An affirmative answer to question 1 or negative answers to questions 2 or 4 result in a determination of no disability. Affirmative answers to questions 3 or 5 establish disability."  *Hines v. Bowen*, 872 F.2d 56, 58 (4th Cir. 1989).

---

[5] An impairment or combination of impairments is "severe" if it "significantly limit[s]" a claimant's "physical or mental ability to do basic work activities," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "seeing, hearing, [or] speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; exercising judgment; "[r]esponding appropriately to supervision, co-workers[,] and usual work situations"; or "[d]ealing with changes in a routine work setting."  20 C.F.R. § 416.922; *see also* 20 C.F.R. § 404.1522 (defining a severe impairment for the purposes of DIB claims).

[6] "Past relevant work" is work "done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 416.960(b)(1); *see also* 20 C.F.R. § 404.1560(b)(1) (defining "past relevant work" for the purposes of DIB claims).  If the claimant can perform his or her past relevant work, a finding of "not disabled" is required.  20 C.F.R. § 416.920(a)(4)(iv); *see also* 20 C.F.R. § 404.1520(a)(4)(iv) (defining the step four inquiry for DIB claims).

[7] At the fifth step, the ALJ may, "'[i]n the ordinary case, . . . resort[ ] to the applicable medical vocational guidelines'" (also known as "the grids") to determine whether the claimant is disabled. *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.  "The grids 'take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.'" *Id.* (alteration in original) (quoting *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996)). However, when a claimant has additional limitations beyond those contemplated by the grids, the ALJ cannot rely on the grids alone to establish non-disability.  *Id.*  In such cases, the testimony of a VE is generally required.  *Smith v. Bowen*, 826 F.2d 1120, 1122 (D.C. Cir. 1987).

The claimant bears the burden of proof at the first four steps of the evaluation.  *Callahan v. Astrue*, 786 F. Supp. 2d 87, 89 (D.D.C. 2011).  At step five, the burden shifts to the Commissioner to identify specific jobs available in the national economy the claimant can perform.  *Id.*  In making this determination, an ALJ may call a vocational expert to testify at the hearing as to whether, based on the claimant's RFC, he or she can perform other work that exists in the national economy.[8]  *Id.* at 90.

### B.    Plaintiff's Disability Claims and Procedural History

Plaintiff was born in June 1970 and has a GED.  *See* ECF No. 8-5 at 2; ECF No. 8-6 at 4.  In June 1999, he shot and killed a man during a traffic altercation, apparently due to his paranoid delusional belief that he was being stalked and would be killed by drug dealers.  *See* ECF No. 8-10 at 98–99.  He was admitted to St. Elizabeth's Hospital in October 2000 for pre-trial examination, adjudicated not guilty by reason of insanity in October 2001, and released from St. Elizabeth's in June 2015 to reside independently in an apartment and receive outpatient mental health and other treatment.  *See id.* at 100; ECF No. 9-3 at 183–84.

Plaintiff filed an application for SSI benefits in August 2016, claiming he had been disabled since January 2001 due to delusional disorder and other mental health issues.  *See* ECF No. 8-5 at 2; ECF No. 8-6 at 3.  The SSA denied Plaintiff's claim initially in October 2016 and on reconsideration in June 2017.  *See* ECF No. 8-4 at 3, 8.  Plaintiff then requested a hearing before an ALJ, which was held in March 2019.  *See id.* at 12; *see also* ECF No. 8-2 at 60.  The ALJ first denied Plaintiff's claim on March 29, 2019, after which Plaintiff sought review by the Appeals Council.  *See* ECF No. 8-3 at 34–52; ECF No. 8-4 at 67–70.  In August 2020, the Appeals Council granted

---

[8] In determining whether "unskilled, sedentary, light, and medium jobs exist in the national economy" that a claimant can perform, a VE may rely on the Dictionary of Occupational Titles, 20 C.F.R. § 404.1566(d)(1), which "provides a brief description of occupations within the national economy and lists the capabilities that each occupation requires of a worker."  *Callahan*, 786 F. Supp. 2d at 90.

his request for review and remanded the case to the ALJ noting, among other errors, that the ALJ's decision

> [did] not indicate that in determining [Plaintiff's RFC], consideration was given to the ample evidence of record that [Plaintiff] requires extensive time every week, and in fact nearly every day, to comply with court-ordered treatment such as medically administered injections, weekly medical appointments, three times weekly therapy sessions, and other group meetings.  There is no accommodation for time off-task or absenteeism, and the decision does not contain a function-by-function assessment of [Plaintiff's] ability to do work-related physical and mental activities with specific references to evidence of record with regard to the mandatory release requirements of [Plaintiff].

ECF No. 8-3 at 59–60.  The Appeals Council further noted that the ALJ "failed to address a third party opinion by [Plaintiff's] mother." *Id.* at 60.  Accordingly, the case was remanded to the ALJ to—again, among other things—consider opinion evidence and explain the weight given to it and "[g]ive further consideration to [Plaintiff's RFC] and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations." *Id.*

Plaintiff and a VE testified at the second hearing on January 28, 2021.  *See* ECF No. 8-2 at 35–59.  Plaintiff testified that he received court-mandated mental health treatment almost every weekday: on Mondays, he had an hour-long individual therapy session with Dr. Lamont Larry; every other Tuesday he had urine screening and in-person counseling sessions at the D.C. Department of Behavioral Health, which took approximately two-and-a-half hours, not including transportation; on Wednesdays, Thursdays, and Fridays, he reported to group therapy, which lasted approximately three-and-one-half hours, not including transportation; and once per month he visited a psychiatrist and received an injection of an antipsychotic mediation.  *See id.* at 41–44.  In addition, he attended hour-long support meetings for addiction weekly.  *See id.* at 44–45.  Plaintiff asserted that he was last employed at Walmart in 2016—working as a maintenance associate from 10:00 p.m. to 7:00 a.m.—but left that job after eight months due to paranoia and ridicule from his

co-workers regarding his mental health history. *See id.* at 46–47, 52–53. Paranoid feelings also led him to isolate himself and made it difficult for him to focus. *See id.* at 48. Plaintiff reported trouble sleeping and an erratic sleep schedule. *See id.* at 48–49.

As to his physical ailments, Plaintiff testified that he had diabetes and, relatedly, glaucoma and neuropathy in his feet; he visited his primary care physician, a urologist, and an eye doctor every three months, and a podiatrist approximately every three months. *See id.* at 45. He also reported "bad knees," which made it difficult for him to stand for more than fifteen minutes at a time without sitting for fifteen minutes to rest. *Id.* at 50–51.

The ALJ then questioned the VE. The ALJ first asked whether there were jobs in signifi-cant numbers in the national economy that could be performed by a hypothetical individual of Plaintiff's age (approximately 50), education (a GED and a certificate in computer programming[9]), and work experience (no past relevant work), who could engage in light work with the following additional limitations: he could occasionally climb ladders, occasionally interact with co-workers and the public, frequently interact with supervisors, and perform only simple, routine, and repeti-tive tasks.[10] *See id.* at 53–54. Relying on the Dictionary of Occupational Titles, the VE testified that such an individual could perform the jobs of marker in a retail setting, cleaner, and laundry folder. *See id.* at 54. If that same individual would have two unexcused absences every month on

---

[9] In the hearing held prior to the Appeals Council's remand, Plaintiff testified that he had a certificate from taking a computer class. *See* ECF No. 8-2 at 67.

[10] "Light work" involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983). Jobs in the category may "require[] a good deal of walking or standing" or "involve[] sitting most of the time but with some pushing and pulling of arm-hand or foot-leg controls." *Id.* "Occasionally" and "frequently" are also defined terms. "'Occasionally' means occurring from very little up to one-third of the time," that is, for a total of "about 2 hours of an 8-hour workday." *Id.* "'Frequent' means occurring from one-third to two-thirds of the time," that is, "for a total of approximately 6 hours of an 8-hour workday. *Id.* at *6.

a consistent basis, however, the VE testified that there would be no work he could perform.  *See id.* at 55.

Plaintiff's counsel then offered her own hypothetical to the VE.  She posited an individual with the limitations outlined in the ALJ's first hypothetical, except that he could have no interaction with co-workers or the general public.  *See id.* at 55.  The VE asserted that such a person could not perform work in the national economy.  *See id.*  Plaintiff's counsel further asked the VE "what percentage of time off task, outside of usual rest breaks, a typical employer would tolerate before [an individual] would be unemployable."  *Id.*  The VE opined that an individual who was off task more than 10% of the time on a regular and consistent basis would not be employable.  *See id.* at 56.  Plaintiff's counsel then clarified that a person who needed to take unscheduled breaks of twenty minutes every two hours would exceed that 10% limit and confirmed that a person with two or more unexcused absences per month would be unemployable.  *See id.*

### C.    The ALJ's Decision

The ALJ issued the decision now under review on April 7, 2021, ultimately finding Plaintiff could perform work that exists in significant numbers in the national economy and therefore was not disabled under the statute and its implementing regulations.  ECF No. 8-2 at 27–28.

#### 1.    Substantial Gainful Activity, Severe Impairment, and the Listings

At step one of the five-part analysis outlined above, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 12, 2016, the application date.  *See id.* at 19.  At step two, the ALJ determined that Plaintiff had the following severe impairments:  schizoaffective disorder, personality disorder, and obesity.  *See id.*

At step three, the ALJ first determined that Plaintiff's obesity, either alone or in combination with other impairments, did not meet or equal a listing.[11]  The ALJ then considered the listings for schizoaffective disorders (listing 12.03) and personality disorders (listing 12.08), ultimately finding that Plaintiff's mental impairments, "considered singly and in combination, [did] not meet or medically equal the criteria" in those listings.  *Id.* at 20.  For an impairment to meet or medically equal listing 12.03, it must satisfy, among other things, either the so-called "paragraph B" or "paragraph C" criteria; an impairment under listing 12.08 must satisfy, among other things, the paragraph B criteria.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A.2.  Paragraph B criteria are met when an impairment causes "'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning": (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.A.2.b; *see also id.* § 12.00E; ECF No. 8-2 at 21.  An individual has a "marked" limitation when his ability to function "independently, appropriately, effectively, and on a sustained basis" in a particular area "is seriously limited" and an "extreme" limitation when he is not able to function "independently, appropriately, effectively, and on a sustained basis" in an area.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F; *see also* ECF No. 8-2 at 21.  To meet the paragraph C criteria, there must be, among other things, evidence that the individual has "minimal capacity to adjust to changes in [his] environment or to demands that are not already part of [his] daily life."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00G.2; *see also* ECF No. 8-2 at 22.

---

[11] "Obesity is not a listed impairment; however, the functional limitations caused by the [medically determinable impairment] of obesity, alone or in combination with another impairment(s), may medically equal a listing."  SSR 19-2, 2019 WL 2374244, at *4 (S.S.A. May 20, 2019).

As to the paragraph B criteria, the ALJ assessed Plaintiff with a mild limitation in understanding, remembering, or applying information.[12] *See* ECF No. 8-2 at 21.  He acknowledged that Plaintiff "reported symptoms of thought content abnormalities including racing thoughts, delusions, hallucinations, and paranoia," but contrasted those representations with those in Plaintiff's function report, which indicated that he "retained the ability to remember, understand, and follow directions" and was able "to use public transportation, play cards, watch television, and handle a savings account." *Id.* (citing ECF No. 8-6 at 21–29).  The ALJ also noted that, although mental status examinations "showed occasions where [Plaintiff] exhibited preoccupied thought content, delusions, and impaired memory," health care providers "generally" found that he had average intelligence, intact memory, and goal-directed thought processes.  *Id.*

Addressing Plaintiff's ability to interact with others,[13] the ALJ again relied on Plaintiff's function report, which reflected that, although Plaintiff lacked "confiden[ce] in conversation" and found it hard to trust people, he nonetheless was able to spend time with others, shop in stores, and

---

[12] The regulations define this area of functioning as involving

>  the abilities to learn, recall, and use information to perform work activities. Examples include: understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.E.1.

[13] This domain refers to an individual's abilities to "relate to and work with supervisors, co-workers, and the public." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.E.2.

>  Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.

*Id.*

use public transportation. *Id.* (citing ECF No. 8-6 at 21–29). Mental status examinations reflected that Plaintiff was sometimes irritable, suspicious of others, anxious, and delusional, but also that he was "positive, cooperative, supportive of his peers in group therapy, and exhibited normal mood, affect, and speech." *Id.* The ALJ therefore found a moderate limitation in this area of functioning.

The ALJ also found that Plaintiff had moderate limitations in concentrating, persisting, or maintaining pace.[14] *See id.* According to his function report, Plaintiff had difficulty concentrating and maintaining attention, but nevertheless played sports, watched television, prepared meals, and performed household chores. *See id.* (citing ECF No. 8-6 at 21–29). Health care providers noted "occasions where [Plaintiff] exhibited preoccupied thought content, an anxious mood, and perse-cutory delusions," but also found him "alert, oriented, [and] attentive," with "goal-directed thought processes." *Id.*

Finally, the ALJ assessed Plaintiff with mild limitations in the realm of adapting or man-aging himself.[15] *See id.* Plaintiff reported that he handled stress and changes in routine well and

---

[14] "This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.E.3.

> Examples include: initiating and performing a task that you understand and know how to do; work-ing at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

*Id.*

[15] "This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.E.4.

> Examples include: responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate pre-cautions.

*Id.*

could "handle a savings account, use public transportation, shop in stores, take medication and maintain grooming without reminders, perform household chores, and prepare meals." *Id.* (citing ECF No. 8-6 at 21–29). The ALJ noted that mental status examinations generally found Plaintiff alert, oriented, well-groomed, [and] positive," with "goal-directed thought processes" and "the ability to recognize the symptoms of his mental illness," although they also occasionally noted suspicion, limited judgment and insight, and delusions. *Id.* at 21–22.

In sum, because Plaintiff's mental impairments did not cause marked limitations in at least two areas of functioning or an extreme limitation in at least one, the paragraph B criteria were not satisfied. As to the paragraph C criteria, the ALJ found "little evidence in the record that [Plaintiff] has only a minimal capacity to adapt to changes in his environment or to demands that are not already a part of his daily life." *Id.* at 22. Therefore, the listings for schizoaffective disorders and personality disorders were not met. *See id.*

### 2.      Plaintiff's RFC

The ALJ then determined that Plaintiff had the RFC "to perform light work . . . except: occasionally climb ladders; able to perform simple, routine, and repetitive tasks; occasionally interact with co-workers and the public." *Id.*

In determining Plaintiff's RFC, the ALJ stated he had considered "all symptoms" and the extent to which those symptoms were consistent with the record evidence, including the objective medical evidence and medical opinions. *Id.* He noted that Plaintiff received "regular treatment for [his] impairments, including one-hour therapy sessions on Monday as a condition of his release from in-patient psychiatric treatment, counseling once a week, . . . a monthly injection," and attendance at "support meetings for drug and alcohol." *Id.* at 23. The ALJ then found that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms

11

of paranoia and delusions, but that the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent" with the evidence in the record.  *Id.*

The ALJ first recounted that Plaintiff had been committed to St. Elizabeth's Hospital for 15 years after he was found not guilty by reason of insanity on murder charges in 2001.  *See id.* at 23.  He was released into the community in June 2015 and approximately eleven months later "decompensated and became highly paranoid and hyper-vigilant."  *Id.*  He was treated with an adjustment to his dosage of the antipsychotic medication Risperdal and his condition improved, although he still reported symptoms of paranoia, racing thoughts, delusions, tearfulness, excessive worrying, sleep difficulties, hallucinations, and anxiety.  *Id.*  The ALJ noted that health care providers "noted on occasion" that Plaintiff was irritable, preoccupied, suspicious, and anxious, as well as exhibited persecutory delusions, impaired memory, and limited judgment and insight.  *Id.* However, he cited medical records describing Plaintiff as "alert, oriented, well-groomed, engaged, positive, cooperative, attentive, [and] supportive of peers in group therapy," with "normal mood and affect, normal speech, goal directed thought processes, average intelligence, good hygiene, intact recent and remote memory, appropriate thought content, good judgment and insight, and the ability to recognize his symptoms of mental illness."  *Id.*  Plaintiff's therapists noted that he was able to participate in role-playing, quizzes, and "question and answer sessions to implement simple problem solving skills."  *Id.*  Plaintiff's psychiatrist attributed an increase in paranoia and mood disturbance in January 2020 to the "wearing off" of the antipsychotic mediation Invega.  *Id.*; *see also* ECF No. 9-9 at 25.  However, the ALJ asserted that when Plaintiff was compliant with treatment—which included Invega and Risperdal injections, prescriptions for the antidepressants Paxil and Trazadone, and individual and group therapy—medical records showed "significant improvement of mental health symptoms."  ECF No. 8-2 at 24.

In a September 2016 consultative examination performed by Phoebe May, Psy.D., Plaintiff was "cooperative, responsive to question[s], [and] well groomed," with "adequate social skills, good humor, normal speech, coherent and goal directed thought processes, normal thought content, a euthymic mood and normal affect, intact attention and concentration, [and] the ability to perform serial threes[] and . . . to recall three out of three objects immediately and after a delay." *Id.* at 23–24. He was assessed with below average intelligence, mildly impaired memory, and fair insight and judgment. *See id.* at 24. A June 2018 psychological assessment found Plaintiff to be calm and friendly, with adequate hygiene, average intelligence, and normal speech, although his "presentation was significant for reported paranoid delusions." *Id.*

The ALJ found that such evidence undermined Plaintiff's contention that "ongoing mental symptoms affect his ability to perform work activities" and "prevent him from performing substantial gainful work activities on a regular and continuing basis." *Id.* Similarly, Plaintiff's reports of his activities suggested "some degree of limitation but not to the extent alleged." *Id.* For example, Plaintiff reported that he spent time with his family and friends, could independently maintain personal grooming, prepare meals, do household chores, shop, manage money, date, go to the movies, watch television, and play video games. *See id.*

As to Plaintiff's obesity, the ALJ recognized it as an impairment that "could reasonably be expected to exacerbate the claimant's other symptoms and impairments," but cited physical examinations reflecting that Plaintiff had a normal range of motion, could ambulate independently with a normal gait, and had no motor or sensory deficits or edema. *Id.*

Turning to the opinion evidence, the ALJ analyzed the reports of the State agency consultants at the initial and reconsideration level, the 2016 report of consultative examiner Dr. May, and a December 2020 mental capacity assessment from his treating psychiatrist Cristina Secarea, M.D.

Addressing Plaintiff's physical impairments, he assigned "partial weight" to the opinion of the State agency consultants at the reconsideration level,[16] which found that Plaintiff had exertional capabilities commensurate with the performance of light work, with no additional postural, manipulative, visual, communicative, or environmental limitations. *See id.* at 25; *see also* ECF No. 8-3 at 24–25. The ALJ determined that Plaintiff's body mass index would support "more restrictive postural limitations than opined." ECF No. 8-2 at 25.

As to Plaintiff's mental impairments, the ALJ assigned "significant weight" to the opinion of the State agency consultant at the initial level. *Id.* at 25. The psychological consultant utilized prior paragraph B criteria[17] to find that Plaintiff had a mild limitation in activities of daily living; a moderate limitation in maintaining social functioning; a moderate limitation in maintaining concentration, persistence, or pace; and had not exhibited repeated episodes of decompensation, each of extended duration. *See* ECF No. 8-3 at 7. She also found that Plaintiff "could carry out simple tasks on a regular basis in order to complete a normal workweek, maintain attendance with only a few problems per month, and complete work at a generally consistent pace comparable to others," and would "work best with limited interaction with the public." ECF No. 8-2 at 25; *see also* ECF No. 8-3 at 10–11. On reconsideration in June 2017, the psychological consultant assessed mild limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in maintaining concentration, persistence, or pace; and no

---

[16] Plaintiff's physical impairments were not analyzed at the initial level. *See* ECF No. 8-3 at 2–13.

[17] The opinions of the State agency consultants at the initial level were issued in October 2016. *See* ECF No. 8-3 at 11. The paragraph B criteria were amended as of January 17, 2017. *See generally Revised Medical Criteria for Evaluating Mental Disorders*, 81 Fed. Reg. 66,138 (Sept. 16, 2016) (to be codified at 20 C.F.R. pts. 404, 416). The prior regulatory scheme identified the four areas of mental functioning as (1) activities of daily living, (2) social functioning, (3) concentration, persistence, or pace, and (4) episodes of decompensation. *See Caitlin O. v. Kijakazi*, No. 17-cv-1939, 2022 WL 17370231, at *5 n.15 (D.D.C. Oct. 27, 2022), *report and recommendation adopted*, 2023 WL 4744068 (D.D.C. July 25, 2023), *appeal docketed*, No. 23-5186 (D.C. Cir. Aug. 23, 2023).

limitations in adapting or managing oneself.   *See* ECF No. 8-3 at 22–23.   The ALJ determined that such findings were largely supported by "generally normal examination findings" since Plaintiff's release from in-patient treatment, but that "non-optimal mental status examination findings showing irritability, preoccupied thought content, suspicion of others, persecutory delusions, an anxious mood, and limited judgment and insight" supported a mild limitation in adapting and managing oneself and a "more restrictive limitation" in interacting with co-workers.   ECF No. 8-2 at 25.

The ALJ gave partial weight to the opinion of the consultative examiner Dr. May, who found that Plaintiff had mild limitations in understanding and performing simple directions and instructions; maintaining attention, concentration, and a regular schedule; learning new tasks; making appropriate decisions; performing complex tasks; and relating adequately with others; and moderate limitations in dealing appropriately with stress.   *See id.* at 26; *see also* ECF No. 8-9 at 27.   Although he found those opinions supported by the examiner's own examination findings, he concluded that the totality of the evidence—including mental status examination findings showing Plaintiff was irritable, preoccupied, and anxious—supported moderate limitations in concentrating, persisting, or maintaining pace and in interacting with others.   *See* ECF No. 8-2 at 26.

Plaintiff's treating psychiatrist's December 2020 assessment was given "some" weight.   *Id.* at 26.   The ALJ reported that Dr. Secarea found Plaintiff had "up to moderate limitations" in understanding and remembering, moderate limitations in social interaction, and marked limitations in sustained concentration and persistence and adaptation.   *See id.*; *see also* ECF No. 9-12 at 67–69.[18]   Relying on Plaintiff's history of psychiatric commitment, weekly therapy sessions,

---

[18] The ALJ's summary is somewhat imprecise.   In the area of understanding and memory, Dr. Secarea's assessment reflects that Plaintiff's ability to understand and remember very short and simple instructions was not significantly limited and his abilities to remember work-like procedures and to understand and remember detailed instructions were

"mandatory attendance at three structured day activities," and Plaintiff's own reports of his symptoms, she opined that Plaintiff's impairments would "frequently interfere with the attention and concentration required to perform simple work-related tasks, would result in absenteeism for more than three days per month and off task limitations in 15 percent of the workday, and result in the requirement for extra breaks at least every two hours."  ECF No. 8-2 at 26; *see also* ECF No. 9-12 at 69–72.  The ALJ found "less restrictive limitations in understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself" were appropriate and rejected "the absenteeism, off task, or extra break limitations opined" as unsupported by the record.  ECF No. 8-2 at 26.  Specifically, he pointed to the

> optimal mental status examination findings documenting claimant as alert, oriented, well-groomed, engaged, positive, cooperative, attentive, supportive of peers in group therapy, and exhibit[ing] normal mood and affect, normal speech, goal directed thought processes, average intelligence, good hygiene, intact recent and remote memory, appropriate thought content, good judgment and insight, and the ability to recognize his symptoms of mental illness.  Additionally, . . . claimant reported significant improvement of his symptoms with treatment.

*Id.*  The ALJ further cited Plaintiff's function report, in which he stated that he could "maintain personal grooming independently, prepare meals, perform household chores, shop, manage money, spend time with friends, date, go to the movies, play video games, and watch television."

---

moderately limited.  *See* ECF No. 9-12 at 67.  As to sustained concentration and persistence, his abilities to carry out very short and simple instructions and make simple work-related decisions were not significantly limited; his ability to carry out detailed instructions was moderately limited; and his abilities to maintain attention and concentration for extended periods, perform actions within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, work in coordination or proximity to others without being distracted, complete a normal workday and work-week without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods were markedly limited.  *See id.* at 67–68.  In social interaction, Plaintiff's abilities to ask simple questions or request assistance, get along with coworkers and peers, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness were not significantly limited; his abilities to interact appropriately with the general public and accept instruction and criticism from supervisors were moderately limited.  *See id.* at 68.  In the area of adaptation, Plaintiff had no limitation in the ability to be aware of normal hazards and take appropriate precautions; marked limitations in the abilities to respond to changes in the work setting, travel in unfamiliar places or use public transportation, and tolerate normal amounts of stress; and an extreme limitation in the ability set realistic goals or make plans independently of others.  *See id.* at 68–69.

*Id.* However, the ALJ agreed with Dr. Secarea's assessment of moderate limitations in social interaction. *See id.*

Finally, the ALJ addressed the third-party function report submitted by Plaintiff's mother, which reflected that Plaintiff's suspicions of other people made him unable to maintain employment and that when he felt threatened he would either be fired or be unwilling to return to work. *See id.*; *see also* ECF No. 8-6 at 13–20.  She further asserted that Plaintiff could prepare meals, do household chores, use public transportation, and handle his personal finances.  *See* ECF No. 8-2 at 26–27; *see also* ECF No. 8-6 at 13–20.  The ALJ stated that he "considered" the report "as part of the completed record" for "subjective evidence pertaining to [Plaintiff's] independent activities of daily living." ECF No. 8-2 at 27.  Noting, however, that Plaintiff's mother "is not an acceptable medical source and [her] assessment is not based on objective medical evidence," the ALJ "assign[ed] it little weight as a functional opinion." *Id.*

Summing up, the ALJ found, based on "evidence including the abovementioned optimal and non-optimal mental status examination findings[,] . . . history of treatment," medical and lay opinions, and Plaintiff's self-reported symptoms and limitations, that Plaintiff "could perform light work with additional postural and mental limitations."  *Id.* at 27.

### 3.    Conclusion of the Five-Step Sequential Inquiry

At step four, the ALJ concluded that Plaintiff had no past relevant work.  *See id.* at 27.  At step five—based on the VE's testimony and the RFC finding—the ALJ found that Plaintiff could perform jobs that exist in significant numbers in the national economy, specifically, marker, laundry folder, and cleaner.  *See id.* at 27–28.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on February 11, 2022.  *Id.* at 2–4.

## II.    LEGAL STANDARD

A federal district court has jurisdiction over a civil case challenging a final decision of the Commissioner.  42 U.S.C. § 405(g).  A reviewing court must affirm the Commissioner's decision if it is based on substantial evidence in the record and the correct application of the relevant legal standards.  *Id.*; *Butler*, 353 F.3d at 999.

"[T]he plaintiff bears the burden of demonstrating that the Commissioner's decision is not based on substantial evidence or that incorrect legal standards were applied."  *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 64 (D.D.C. 2006).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It requires "more than a scintilla [of evidence], but can be satisfied by something less than a preponderance of the evidence."  *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003) (quoting *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002)).  Ultimately, the substantial evidence standard is a "low bar," *La. Pub. Serv. Comm'n v. FERC*, 20 F.4th 1, 7 (D.C. Cir. 2021), and "requires considerable deference to the decision rendered by the ALJ," *Crosson v. Shalala*, 907 F. Supp. 1, 3 (D.D.C. 1995); *see also Biestek v. Berryhill*, 587 U.S. __, __, 139 S. Ct. 1148, 1154 (2019) ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency [under the substantial evidence standard] is not high.").  The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment "concerning the credibility of the evidence with its own."  *Crosson*, 907 F. Supp. at 3; *see also Butler*, 353 F.3d at 999 (finding that the district court's role is not to reweigh the evidence but only to determine whether the ALJ's findings are "based on substantial evidence and a correct application of the law").  However, "this standard of review requires the Court to carefully

scrutinize the entire record to ensure that the Commissioner, through the ALJ, has both analyzed all of the evidence available and has sufficiently explained his/her reasoning and the weights given to the facts." *Pinkney v. Astrue*, 675 F. Supp. 2d 9, 14 (D.D.C. 2009); *see also Lane-Rauth*, 437 F. Supp. 2d at 65 ("[T]his standard of review 'calls for careful scrutiny of the entire record,' to determine whether the Commissioner, acting through the ALJ, 'has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits[.]'" (second alteration in original) (quoting *Butler*, 353 F.3d at 999)). In applying this standard, courts "must also be mindful of the harmless-error rule. Consequently, even if [the court] perceive[s] error," it must "affirm the Commissioner's decision unless the error is prejudicial." *Saunders v. Kijakazi*, 6 F.4th 1, 4 (D.C. Cir. 2021).

Finally, the Court's job is to "consider the grounds actually proffered by the ALJ" rather than to make those determinations for itself, *Ward v. Berryhill*, 246 F. Supp. 3d 202, 210 (D.D.C. 2017), or credit "post-hoc rationalization[s]" advanced by the parties, *Cooper v. Berryhill*, No. 16-cv-1671, 2017 WL 4326388, at *5 (D.D.C. Sept. 28, 2017); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that a reviewing court "must judge the propriety of [an agency's judgment] solely by the grounds invoked by the agency"); *Jones v. Astrue*, 647 F.3d 350, 356 (D.C. Cir. 2011) (citing *Chenery*, 332 U.S. at 196).

## III.    DISCUSSION

Plaintiff offers a number of arguments as to why the ALJ's (now the Commissioner's) decision must be vacated or reversed. First, he asserts that the ALJ should have included "an accommodation for the demonstrated absenteeism required by [Plaintiff's] court-ordered mental health treatment." ECF No. 22 at 16. Second, and somewhat relatedly, he contends that the ALJ failed to properly evaluate the December 2020 mental health assessment from Plaintiff's treating

psychiatrist Dr. Secarea, which found that Plaintiff would be absent from work at least three days per month "due to treatment needs" and would be off-task more than 15% of an eight-hour work-day. *Id.* at 18. Third, he argues that the ALJ erroneously discounted Plaintiff's mother's opinion testimony solely on the basis that she was not an acceptable medical source under the regulations. *See id.* at 22. Fourth, he objects to the hypotheticals the ALJ presented to the VE, asserting that they included "abilities that the ALJ determined [Plaintiff] *lacks*" and failed to account for Plaintiff's limitations in maintaining concentration, persistence, and pace and his postural limitations. *Id.* at 25–26. Finally, he maintains that the ALJ "ignored the VE's testimony that a hypothetical individual with [Plaintiff's] absenteeism would be unemployable." *Id.* at 26.

The discussion below groups together the three arguments—the first, second, and fifth—that implicate evidence of Plaintiff's treatment demands and their effect on his ability to maintain regular attendance at a job. Because the ALJ's analysis (or lack of analysis) of this evidence was faulty, the case will be remanded to the SSA. Plaintiff's remaining arguments are addressed only briefly.

### A.     Absenteeism Due to Court-Ordered Treatment

This section examines the ALJ's treatment of evidence of Plaintiff's absenteeism due to treatment needs, the ALJ's assessment of Dr. Secarea's opinion that Plaintiff would be absent from work more than three times per month, and the VE's testimony regarding acceptable levels of absenteeism in competitive employment, ultimately determining that the ALJ's errors require remand to the SSA for further administrative proceedings.

#### 1.     Evidence of Plaintiff's Court-Ordered Treatment

Plaintiff argues that the record establishes that he "is required to spend approximately 13 hours per week (without factoring in transportation time) attending court-ordered mental health

treatment, nearly every day," and that his assessed RFC therefore should have included an accommodation accounting for these required absences, especially in light of the fact that SSR 96-8p requires an ALJ to consider "*all* of the relevant evidence in the case record," including "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)."  ECF No. 22 at 8, 16 (quoting SSR 96-8p, 1996 WL 374184, at *5).  The Commissioner counters that (1) the ALJ properly considered such allegations but found them inconsistent with the record evidence; (2) under SSR 96-8p (the same Social Security Ruling Plaintiff cites in support of his argument), a functional limitation must be caused by an individual's medically determinable impairments and therefore cannot be based on factors such as the need to attend medical appointments, and (3) Plaintiff has not shown that he could not perform work "that occurred during late afternoons, nights, or weekends" and so did not conflict with his medical appointments.[19]  ECF No. 24 at 15–17.  The following discussion addresses each of the Commissioner's arguments, but out of order, beginning with the thorny but tractable dispute concerning SSR 96-8p.

SSR 96-8p sets out the SSA's "policies and policy interpretations regarding the assessment of residual functional capacity . . . in initial claims for disability benefits under titles II and XVI of the Social Security Act."  1996 WL 374184, at *1.  RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  *Id.*  The ruling makes clear that, "in assessing RFC, the

---

[19] The Commissioner also contends that the record "suggests that Plaintiff's need for treatment was not the reason he was unable to keep employment during the relevant period"; rather, his criminal record and a disinclination to work because of its potential effect on SSI benefits were.  ECF No. 24 at 17–18.  The Court must consider only "the grounds actually proffered by the ALJ," *Ward*, 246 F. Supp. 3d at 210, and may not credit "post-hoc rationalization[s]" advanced by the parties, *Cooper*, 2017 WL 4326388, at *5.  The ALJ did not rely on Plaintiff's criminal record or alleged reluctance to work in finding Plaintiff not disabled.  The Court will therefore not address these allegations further.

adjudicator must consider only limitations and restrictions attributable to medically determinable impairments. It is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) . . . ." *Id.* at *2. On the other hand, and perhaps antithetically, it requires the ALJ to consider evidence of "limitations or restrictions imposed by the mechanics of treatment," including the "frequency of treatment, duration, disruption to routine, [and] side effects of medication." *Id.* at *5. Relying on SSR 98-6p, Courts have announced different views on whether an ALJ may include in the RFC formulation limitations based on an individual's treatment demands. The Commissioner cites the Eleventh Circuit's decision in *Cherkaoui v. Commissioner of Social Security*, *see* ECF No. 24 at 16, which finds that "whether the number of medical appointments affects [an individual's] ability to work is not an appropriate consideration for assessing . . . residual functional capacity because that determination considers only the functional limitations and restrictions resulting from medically determinable impairments." *Cherkaoui*, 678 F. App'x 902, 903 (11th Cir. 2017) (citing SSR 96-8p); *see also Lindsley v. Colvin*, No. 15-cv-876, 2017 WL 473652, at *5 (W.D.N.Y. Feb. 4, 2017) ("[A] finding of disability must rest on a claimant's medically determinable impairment, not on factors such as the need to attend appointments." (citing SSR 96-8p)). Plaintiff relies on the Fifth Circuit's opinion in *Newton v. Apfel*, *see* ECF No. 22 at 16, which states that "[i]f an individual's medical treatment significantly interrupts the ability to perform a normal, eight-hour work day, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity." *Newton*, 209 F.3d 448, 459 (5th Cir. 2000) (citing *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980)); *see also Meyer v. Astrue*, 662 F.3d 700, 707 n.3 (4th Cir. 2011) ("[W]e further instruct the Commissioner on remand to 'consider the effect of [this] ongoing treatment on [Meyer's] ability to remain gainfully employed during the period of claimed disability.'" (second and third alteration in

original) (quoting *Newton*, 209 F.3d at 459)); *Jarvis v. Kijakazi*, No. CV 20-37, 2023 WL 2262812, at *5 (D. Mont. Feb. 28, 2023) ("The ALJ must account for treatment time in the RFC determination and hypotheticals posed to the vocational expert where the claimant has 'presented evidence sufficient to establish the possibility that the frequency of [the claimant's] medical appointments may inhibit [the claimant's] ability to work on a "regular and continuing basis."'" (alterations in original) (quoting *Bourcier v. Saul*, 856 F. App'x 687, 690–91 (9th Cir. 2021))); *Michelle C. v. Kijakazi*, No. 20-cv-12940, 2022 WL 500568, at *6 (D.N.J. Feb. 18, 2022) (noting that "[t]he Court of Appeals for the Third Circuit has held that, in determining a claimant's RFC, the Commissioner must consider the effect of a claimant's time off work for medical episodes," such as hospitalizations and medical appointments, and citing *Kangas v. Bowen*, 823 F.2d 775, 778 (3d Cir. 1987), among other cases)); *Ricci v. Saul*, No. 19-cv-110, 2020 WL 7047309, at *11 (D. Idaho Nov. 30, 2020) ("[Plaintiff's] absenteeism necessitated by medical and chiropractic appointments, or her time off-task for taking medications and waiting for their effects to begin, might interfere with her ability to work on a 'regular and continuing basis' if such activities preclude her from working '8 hours a day, for 5 days a week, or an equivalent work schedule.'" (quoting SSR 96-8p)); *Quinto v. Berryhill*, No. 17-cv-24, 2017 WL 6017931, at *4 (D. Conn. Dec. 1, 2017) ("Courts have found that the ALJ must consider, *inter alia*, the extent to which the frequency or duration of treatment requires the claimant to be absent from or take breaks during the typical workday." (citing SSR 96-8p and collecting cases)); *Griffin v. Comm'r of Soc. Sec.*, No. 15-cv-13715, 2017 WL 991006, at *2 (E.D. Mich. Mar. 15, 2017) ("Absenteeism due to the frequency of treatment is a relevant factor so long as the treatment is medically necessary and concerns the conditions on which the disability claim is founded." (citing SSR 98-6p and collecting cases)); *Gotsis v. Commissioner of Soc. Sec.*, No. 17-cv-10075, 2013 WL 1289280, at *4–5 (E.D. Mich. Mar. 28, 2013)

(relying on SSR 96-8p and *Newton* to determine that "the ALJ's finding that Plaintiff could maintain an 8-hour workday is not supported by substantial evidence, in light of Plaintiff's required phototherapy treatments," which occurred "two to three times a week").

The interpretation in the latter cases—that an RFC or finding of disability may include limitations or accommodations traceable to an individual's medical treatment—is the better one. First, SSR 96-8p *requires* an ALJ to "consider . . . limitations or restrictions imposed by the mechanics of treatment," including the frequency and duration of treatment, in formulating an RFC. 1996 WL 374184, at *5. It makes little sense to require consideration of such limitations or restrictions while barring their inclusion in the RFC on the ground that they do not "result from an individual's medically determinable impairment or combination of impairments." *Id.* at *1. More, the provision of SSR 96-8p that the Commissioner (and the *Cherkaoui* panel) relies on—which states that "[t]he RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms," SSR 96-8p, 1996 WL 374184, at *1—need not be read to bar limitations and restrictions based on treatment mechanics. Rather, it is easy to see how those limitations *should* be regarded as "result[ing] from an individual's medically determinable impairment[s]"; after all, medical appointments at which treatment is received are generally—or, at least, can be—consequent to a medically determinable impairment.[20] The remainder of that paragraph from SSR 98-6p bolsters this interpretation:

> Age and body habitus are not factors in assessing RFC. It is incorrect to find that
> an individual has limitations beyond those caused by his or her medically

---

[20] Additionally, "side effects of medication"—another example of "mechanics of treatment" that must be considered pursuant to SSR 96-8p—are regularly and uncontroversially taken into account when formulating RFC. *See, e.g.*, *Lomax v. Comm'r of Soc. Sec.*, No. 20-cv-55, 2021 WL 3508087, at *6–8 (D.D.C. Aug. 4, 2021) (stating that "[c]onsideration of the 'side effects of medication' applies to both the assessment of functional limitation and the 'RFC assessment'" and recommending remand where the ALJ did not properly address limitations due to medication side

determinable impairment(s) and any related symptoms, due to such factors as age and natural body build, and the activities the individual was accustomed to doing in his or her previous work.

*Id.* That is, SSR 96-8p describes the types of factors that should not be considered in RFC formulation, such as "age and natural body build" and previous work activities. Those considerations are much further removed from "limitations . . . caused by . . . medically determinable impairment(s)"—indeed, they are arguably unrelated to any impairment—than are treatment frequency and duration, for which, as noted above, there is a clear link. It makes sense that the former should not be considered even if the latter are. To get at a similar point another way, treatment mechanics like frequency and duration of treatment, which *must* be considered, are not of the same general character as the prohibited factors of age and body habitus, so there is little reason to interpret SSR 98-6p's prohibition as including treatment mechanics. Thus, the language of SSR 98-6p itself indicates that frequency and duration of treatment are permissible factors on which to base an RFC limitation. The Court therefore rejects the Commissioner's position that "[a] finding of disability [cannot] rest . . . on factors such as the need to attend appointments."

The question becomes, then, whether the ALJ properly considered the evidence of Plaintiff's treatment demands. The Commissioner insists that he did, contending that "the ALJ expressly recognized and considered that Plaintiff required treatment with medication, injections, individual therapy, and group therapy and that Plaintiff argued he was unable to work on a regular and continuing basis." ECF No. 24 at 15. As support, the Commissioner cites the page of the ALJ's opinion found at ECF No. 8-2 at 24 (cited as "Tr. 23"). But a check of the ALJ's opinion reveals that the sentence to which the Commissioner refers makes no mention of Plaintiff's

---

effects at steps three, four, or five of the sequential analysis (emphasis omitted) (quoting SSR 96-8p)), *report and recommendation adopted*, 2021 WL 3722730 (D.D.C. Aug. 23, 2021). It is not clear why limitations based on frequency and duration of treatment, which are also related to an individual's treatment, should be proscribed.

required treatment: it merely states, "[I]n a brief submitted by the claimant's representative, claimant indicated his impairments prevent him from performing substantial gainful work activities on a regular and continuing basis."[21]  ECF No. 8-2 at 24.  The Court finds that this single sentence in the ALJ's opinion, which itself fails to mention the frequency and duration of Plaintiff's treatment, is weak evidence that the ALJ "considered" those treatment mechanics.  SSR 96-8p, 1996 WL 374184, at *5.

The Commissioner then asserts that the ALJ sufficiently considered those treatment mechanics because he relied on the reports of the State agency psychological consultants, who recognized that Plaintiff would have "some difficulty maintaining a schedule" and on the consultative examiner's report that assessed "only mild limitation in maintaining a regular schedule."  ECF No. 24 at 16.  The Commissioner is on marginally stronger ground here.  Although the ALJ's opinion does not mention that any limitations in Plaintiff's ability to maintain a regular schedule may be traceable to the duration and frequency of his treatment, he does cite the State agency consultants' opinions that Plaintiff could "maintain attendance with only a few problems per month," ECF No. 8-2 at 25, and those consultants expressly noted that Plaintiff's "few [attendance] problems per month" were "based on his regular current participation in treatment," ECF No. 8-3 at 11, 26.

Oddly, the Commissioner does not cite what is perhaps the strongest evidence that the ALJ considered Plaintiff's continuing treatment obligations.  Near the beginning of the section of the opinion in which the ALJ formulated Plaintiff's RFC, he mentioned that Plaintiff "receives regular treatment for [his] impairments, including one-hour therapy sessions on Monday as a condition of

---

[21] As support for that statement, the ALJ cited the first page of Exhibit 19B, which is found at Tr. 288, or ECF No. 8-4 at 146.  *See* ECF No. 8-2 at 24; ECF No. 24 at 15.  That is the first page of a brief Plaintiff submitted to the ALJ prior to the January 28, 2021 hearing.  *See* ECF No. 8-4 at 146.  Although that page does mention that Plaintiff "participates in a group therapy 'day' program three days a week, meets with his psychiatrist . . . weekly . . . , attends Narcotics Anonymous meetings, and must visit the Department of Behavioral Health's Forensic Outpatient Department for weekly urine screenings, biweekly to monthly medication injections, and monthly psychiatric appointments,"—it does not argue that those treatment requirements support a finding of disability.  ECF No. 8-4 at 146–47.

his release from in-patient psychiatric treatment, counseling once a week, and a monthly injection"
and "participates in support meetings for drug and alcohol," citing Plaintiff's hearing testimony.
ECF No. 8-2 at 23.  Of course, what Plaintiff actually testified was that he had court-ordered treat-
ment obligations almost every weekday, consisting of sessions with a therapist on Mondays; urine
screening and in-person counseling sessions at the D.C. Department of Behavioral Health every
other Tuesday; group therapy on Wednesdays, Thursdays, and Fridays; monthly medication injec-
tions and sessions with a psychiatrist, and weekly support meetings.  ECF No. 8-2 at 41–45.  None-
theless, the ALJ's use of the word "including" indicates "that the list that follows is meant to be
illustrative rather than exhaustive," *Samantar v. Yousuf*, 560 U.S. 305, 317 & n.10 (2010), so the
statement is not inaccurate, even if it is somewhat misleading.  Because these references indicate
that the ALJ was aware of the frequency and duration of Plaintiff's treatment, the Court will as-
sume that the ALJ at least minimally "considered" the mechanics of Plaintiff's treatment as SSR
96-8p directs.

But that does not get the Commissioner where he wants to be.  Beyond merely "con-
sider[ing] all the evidence in the administrative record when reaching a conclusion regarding a
plaintiff's disabilit[y]," the ALJ "must compose a 'narrative discussion'" that "construct[s] a 'log-
ical bridge' connecting the ALJ's conclusions to the evidence of record."  *Gause v. Saul*, No. 18-
cv-443, 2019 WL 12251880, at *10 (D.D.C. Sept. 30, 2019) (first quoting SSR 06-8p, 1996 WL
374184, at *7, and then quoting *Lane-Rauth*, 437 F. Supp. 2d at 67), *report and recommendation
adopted*, 2019 WL 12251885 (D.D.C. Oct. 22, 2019).  The ALJ's opinion does not meet that
standard.  For example, in discounting Plaintiff's testimony about extensive court-ordered treat-
ment obligations weekly, the ALJ cited evidence such as

> numerous mental status examination findings document[ing] [Plaintiff] as alert, ori-
> ented, well-groomed, engaged, positive, cooperative, attentive, supportive of peers

> in group therapy and exhibit[ing] normal mood and affect, normal speech, goal di-
> rected thought processes, average intelligence, good hygiene, intact recent and re-
> mote memory, appropriate thought content, good judgment and insight, and the
> ability to recognize his symptoms of mental illness.

ECF No. 8-2 at 23.  But he does not explain how those mental status findings undermine Plaintiff's

testimony about his court-ordered treatment obligations; indeed, the ALJ later supports his RFC

formulation by stating that there was "significant improvement" in Plaintiff's mental health symp-

toms "*when compliant with treatment*," thus indicating that such treatment is necessary for Plaintiff

to maintain the "optimal" mental status findings cited.  *Id.* at 24, 25 (emphasis added).

Similarly, in according diminished weight to Dr. Secarea's opinion (also discussed below

in Section III.A.2) that Plaintiff's impairments, "ongoing weekly therapy sessions, [and] manda-

tory attendance [at] three structured day activities" would "result in absenteeism for more than

three days per month," the ALJ cited the same "optimal mental status examination findings" noted

above and again relied on the "significant improvement of [Plaintiff's] symptoms with treatment."

*Id.* at 26.  Again, the ALJ does not explain how "optimal mental status examinations" undermine

Dr. Secarea's opinion that Plaintiff's required treatment—treatment that includes "ongoing weekly

therapy sessions, [and] mandatory attendance [at] three structured day activities"—would lead to

excessive absenteeism.[22]  *Id.*

Perhaps more glaringly, the ALJ gave "significant weight" to the opinions of the State

agency psychological consultants, who *also* opined that Plaintiff's attendance at work would have

"a few problems per month."  *Id.* at 25; *see also* ECF No. 8-3 at 11, 26.  The VE testified that two

absences every month on a consistent basis would preclude competitive employment.  *See* ECF

No. 8-2 at 55.  And yet the State agency psychological consultants assessed that Plaintiff's ability

---

[22] This is a not a situation, that is, where evidence of generally normal mental status examinations supports the ALJ's
rejection of a treating physician's opinion that the plaintiff had marked limitations in one or more areas of mental
functioning.  *See, e.g.*, *Mirlin T. v. Kijakazi*, No. 20-cv-960, 2021 WL 9217635, at *12 (D.D.C. Aug. 24, 2021).

to maintain regular attendance was only moderately limited.  *See* ECF No. 8-3 at 10, 26.  "In performing the RFC assessment, the ALJ must explain how he considered and resolved any 'material inconsistencies or ambiguities' evident in the record . . . ." *Butler*, 353 F.3d at 1000 (quoting SSR 96-8p, 1996 WL 374184, at *7).  Here, the ALJ failed to explain how having "a few" attendance problems every month, which the VE's testimony indicates would make an individual unemployable, is consistent with State agency psychological consultants' determination that Plaintiff had only moderate limitations in maintaining attendance.  If the ALJ chose not to credit those parts of the opinions of the State agency psychological consultants predicting a few attendance problems every month in favor of their assessment of only moderate attendance issues, he was obliged to explain why.  *See, e.g.*, *Patricia T. v. Kijakazi*, No. 21-cv-1028, 2022 WL 3583634, at *11 (D.D.C. Aug. 22, 2022) (collecting cases for the principle that, although an ALJ may reject parts of a medical opinion he otherwise finds persuasive, in doing so he must explain his reasoning); *see also Gause*, 2019 WL 12251880, at *11 (similar).  The Court agrees with Plaintiff's conclusion that, although the ALJ "evaluated the impact of [Plaintiff's] reported mental health symptoms on his RFC," he failed to sufficiently explain "how [Plaintiff's] court-mandated treatment affected his ability to maintain work on a regular and continuing basis."  ECF No. 26 at 13.

Finally, the Commissioner faults Plaintiff for failing to show "that he was unable to seek employment that occurred during late afternoons, nights, or weekends, which would have allowed him to attend his appointments."  ECF No. 24 at 17.  Indeed, the record shows that Plaintiff was employed as a maintenance worker on a non-traditional schedule for eight months in 2016.  ECF No. 8-2 at 46–47, 52–53.  But the ALJ's opinion does not so much as hint that the potential for Plaintiff to maintain regular attendance on a non-traditional work schedule underlay the rejection of Plaintiff's testimony indicating that medical treatment would interfere with his attendance at

work, Dr. Secarea's opinion that medical treatment would cause excessive absenteeism, or the State agency psychological consultants' assessment that medical treatment would lead to attendance issues every month.  Instead, the ALJ either relied on mental status findings that were not germane or, in the case of the State agency psychological consultants, simply neglected to explain how he assessed their opinion on Plaintiff's likely attendance problems.  Again, the Court must consider only "the grounds actually proffered by the ALJ," *Ward*, 246 F. Supp. 3d at 210, and may not credit "post-hoc rationalization[s]" advanced by the parties, *Cooper*, 2017 WL 4326388, at *5.

In sum, the Court can discern no "'logical bridge' connecting the ALJ's conclusion[]" regarding Plaintiff's alleged absenteeism "to the evidence of record."  *Gause*, 2019 WL 12251880, at *10 (quoting *Lane-Rauth*, 437 F. Supp. 2d at 67).

### 2.    Treating Physician's Opinion

Plaintiff argues that the ALJ gave short shrift to the opinion of Plaintiff's treating psychiatrist, Dr. Secarea—specifically to her findings that Plaintiff would miss more than three days of work per month due in part to his treatment.  *See* ECF No. 22 at 19.

Under the regulations in force at the time Plaintiff filed his claims, medical opinions by an individual's treating physicians were "entitled to 'controlling weight' if they are not inconsistent with other substantial record evidence and are well-supported by medically acceptable clinical and laboratory diagnostic techniques."  *Butler*, 353 F.3d at 1003 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).[23]  Thus, "[a] treating physician's report is 'binding on the fact-finder unless contradicted by substantial evidence.'"  *Butler*, 353 F.3d at 1003 (quoting *Williams v. Shalala*, 997 F.2d 1494, 1498 (D.C. Cir. 1993)).  If an ALJ fails to give a treating physician's opinion controlling or substantial weight, he must explain "why he has rejected the treating physician's opinion and

---

[23] Those regulations were eliminated for claims filed after March 27, 2017, and replaced with new standards for the evaluation of opinion evidence.  *See* 20 C.F.R. §§ 404.1520c, 416.920c.

how the doctor's assessment is contradicted by substantial evidence." *Kenner v. Berryhill*, 316 F. Supp. 3d 530, 537 (D.D.C. 2018) (quoting *Jacob v. Berryhill*, No. 15-cv-600, 2017 WL 1194165, at *6 (D.D.C. Mar. 30, 2017)); *see also Butler*, 353 F.3d at 1003 ("As the regulations assure claimants, '[w]e will always give good reasons in our notice of . . . decision for the weight we give your treating source's opinion.'" (alterations in original) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2))).  The ALJ's analysis should take into account six factors enumerated in the regulations: (1) the length and frequency of the treating relationship; (2) the nature and extent of that relationship; (3) the quality of the explanation provided for the opinion, known as the "supportability" of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the medical source; and (6) any other factors in the record that "tend to support or contradict the medical opinion."  20 C.F.R. § 416.927(c).  However, the ALJ need not explicitly address each of those six factors in his opinion; rather, "the regulations require only that 'good reasons' be provided for the weight given a treating physician's opinion." *Turner v. Astrue*, 710 F. Supp. 2d 95, 106 (D.D.C. 2010) (quoting 20 C.F.R. § 416.927(d)(2)).  Often, "citations to contradictory evidence are sufficient explanation for an ALJ's decision to discount the medical opinion of a treating physician." *Matthews v. Saul*, No. 18-cv-1110, 2020 WL 5440573, at *1 (D.D.C. Sept. 10, 2020).

As should be clear from the discussion above, the ALJ failed to provide "good reasons" for discounting Dr. Secarea's opinion that Plaintiff's treatment obligations would cause excessive absenteeism.  As Plaintiff puts it, the ALJ "did not cite any evidence contradicting the demands of [Plaintiff's] treatment regimen but instead relied only on 'optimal mental status examination findings' showing [Plaintiff] to be 'alert, oriented, [and] well-groomed,' for example, characteristics that have no bearing on [Plaintiff's] need to miss work to attend court-mandated treatment."  ECF

No. 22 at 19. Nor does the ALJ's opinion as a whole "cite any evidence from the record that—on

its face—contradicts" this aspect of Dr. Secarea's opinion. *Grant v. Kijakazi*, 619 F. Supp. 3d 128,

140 (D.D.C. 2022). Accordingly, "the ALJ did not 'provide a sufficient basis for this Court to

understand [his] reasoning when viewing the decision as a whole.'"[24] *Id.* (quoting *Colter v. Ki-*

*jakazi*, No. 20-cv-632, 2022 WL 715218, at *11 (D.D.C. Mar. 10, 2022)); *cf., e.g.*, *Darlene M. v.*

*Kijakazi*, No. 20-cv-1817, 2021 WL 6841641, at *19 (D.D.C. Sept. 3, 2021) (finding the ALJ

provided sufficient reasons for discounting a treating physician's opinion where it was clear from

the opinion as a whole that he was "aware of the evidence upon which [the treating physician]

relied . . . and had already explained why he discounted that evidence").

### 3.     VE Testimony and Remedy

Plaintiff contends that the ALJ's conclusion that Plaintiff could perform jobs that existed

in significant numbers in the national economy was flawed because it "impermissibly overlooks

the VE's opinion that a claimant with [Plaintiff's] characteristics who experiences 'two or more

unexcused absences every month on a consistent basis' is unemployable." ECF No. 22 at 26

(quoting ECF No. 8-2 at 55). This complaint appears to be, as the Commissioner notes, "really"

about "the ALJ's choice not to include [an excessive absenteeism] limitation in the RFC." ECF

No. 24 at 27. If Plaintiff had established at this point that the RFC should have included a limita-

tion based on excessive absenteeism, then the ALJ's failure to rely on the VE's testimony that

excessive absenteeism rendered Plaintiff unemployable would be error. In that event, too, remand

merely for a calculation of benefits would be appropriate "[g]iven the certainty in the record as to

---

[24] Because this is a sufficient reason to find that the ALJ did not analyze Dr. Secarea's opinion appropriately, the Court does not address Plaintiff's arguments that the ALJ failed to consider each of the six factors in 20 C.F.R. § 416.927(c) and failed to explain how Plaintiff's activities of daily living, such as his ability to prepare meals, watch television, and spend time with friends, would "equate to an ability to perform work-related activities on a sustained basis." *See* ECF No. 22 at 20–21.

[the] plaintiff's disability." *Espinosa v. Colvin*, 953 F. Supp. 2d 25, 38 (D.D.C. 2013); *see also Ademakinwa v. Astrue*, 696 F. Supp. 2d 107, 112 (D.D.C. 2010) (reversing and remanding for calculation of benefits where "additional proceedings would simply delay the 'inevitable receipt of benefits'" (quoting *Hawkins v. Massanari*, No. 00-cv-2102, 2002 WL 379898, at *6 (D.D.C. Mar. 8, 2002)); *Lockard v. Apfel*, 175 F. Supp. 2d 28, 34 (D.D.C. 2001) (reversing and remanding for calculation of benefits where "it would be virtually impossible for [the ALJ] to find against [the] plaintiff upon remand").  However, Plaintiff has not yet made that showing.

To be sure, there is significant evidence in the record that Plaintiff's medical appointments would interfere with his ability to work a traditional schedule.  However, there is also evidence in the record that Plaintiff's conditions of release require his three-day-per-week participation in group therapy only "when not working."  *See* ECF No. 8-3 at 8 (State agency consultant's report that Plaintiff "participated in the Green Door day program, [which] it appears . . . is required as part of his conditional release (participation when not working, urine screens, etc.");  *see also* ECF No. 8-2 at 71 (Plaintiff's testimony that he "go[es] to a program three days a week.  It used to be called Green Door, but now it's called MBI").  More, Defendant has cited case law indicating that an ALJ may consider a claimant's ability to work a non-traditional schedule when determining disability.  *See* ECF No. 24 at 17 (citing *Ivy S. v. Kijakazi*, No. 20-cv-981, 2021 WL 5988410, at *4 (W.D.N.Y. Dec. 16, 2021), and *Glover v. Comm'r of Soc. Sec.*, No. 20-cv-6802, 2022 WL 970517, at *6 (S.D.N.Y. Mar. 31, 2022)).  And, of course, Plaintiff himself had such a job in 2016 (although it did not last long and did not rise to the level of substantial gainful activity).  *See* ECF No. 8-2 at 52–53; ECF No. 8-3 at 36–37 (noting that Plaintiff's work in 2016 did not constitute substantial gainful activity).  The potential that there are jobs in significant numbers that Plaintiff could perform even with his current treatment schedule could be further explored with a VE.  *See*

*Callahan*, 786 F. Supp. 2d at 93 ("This Circuit has . . . instructed that '[i]f the case is one that involves the taking of additional evidence for any reason, the district court is obligated to obtain enhancement or revision of the record by way of remand to the [Commissioner].'" (second and third alterations in original) (quoting *Igonia v. Califano*, 568 F.2d 1383, 1389 (D.C. Cir. 1977))). Finally, where the ALJ has "failed to offer sufficient reasoning for the weight accorded to [medical] opinions," the typical remedy is remand "for re-evaluation" of those opinions. *Ward v. Berryhill*, 246 F. Supp. 3d 202, 210 (D.D.C. 2017); *see also, e.g.*, *Jackson v. Barnhart*, 271 F. Supp. 2d 30, 36 (D.D.C. 2022) (similar); *Grant*, 619 F. Supp. 3d at 140 (similar).

*     *     *     *     *

To sum up, the ALJ failed to build a logical bridge connecting his decision not to include in the RFC a limitation related to excessive absenteeism to the record evidence and failed to give good reasons for discounting Dr. Secarea's opinion that Plaintiff would be absent from work more than three times per month due in part to his treatment demands.  However, because Plaintiff has not shown that the record conclusively establishes his disability and because there is the potential for further development of the record, the case shall be remanded to the ALJ for further administrative proceedings.[25]  The remainder of this opinion will briefly address Plaintiff's remaining arguments.

## B.    Remaining Arguments

### 1.    Lay Testimony

Plaintiff's mother, who asserted that she spent approximately fourteen hours per week with him, submitted a third-party function report asserting that he is "unable to maintain a job because

---

[25] The government does not contend that these errors are harmless, nor would such an argument succeed.  As the discussion above makes clear, there is evidence in the record that would allow—but does not require—the ALJ to find on remand that Plaintiff's treatment mechanics render him disabled under the statute and regulations.

34

his mental illness causes him to be suspicious of people," who he believes "are a threat and want to harm him." ECF No. 8-6 at 13. Those delusions led him to miss work or be "fired because of his bizarre behavior." *Id.* She further asserted that he had problems with personal care when "in crisis," but could otherwise prepare meals, clean his apartment, do laundry, use public transportation, and handle money, among other things. *See id.* at 14–20. The ALJ noted most of this testimony and stated that he considered it "particularly for subjective evidence pertaining to [Plaintiff's] independent activities of daily living," while noting that, because Plaintiff's mother "is not an acceptable medical source and [her] assessment is not based upon objective medical evidence," he assigned it "little weight as a functional opinion." ECF No. 8-2 at 26–27. Plaintiff maintains that discounting the opinion on those grounds "was legally inadequate" under 20 C.F.R. § 416.927(f) because the ALJ "did not acknowledge, let alone discuss, [Plaintiff's mother's] close understanding of [Plaintiff's] limitations" derived from her relationship with him and the fourteen hours per week she spends with him and because "the fact that [she] is not an acceptable medical source is not itself a valid reason to reject her opinion." ECF No. 22 at 22–23.

Section 416.927(f) concerns "[o]pinions from medical sources who are not acceptable medical sources [as defined in the regulations] and from nonmedical sources."[26] It provides that

---

[26] SSR 06-03p is a policy interpretation ruling issued in August 2006 that discusses, among other things, how the SSA "consider[s] opinions from sources who are not 'acceptable medical sources,'" like Plaintiff's mother. 2006 WL 2329939, at *1 (S.S.A. Aug. 9, 2006). On March 27, 2017, a notice of rescission appeared in the Federal Register stating, "Effective Date: This rescission will be effective for claims filed on or after March 27, 2017." Recission of Social Security Rulings 96-2p, 96-5p, and 06-03p, 82 Fed. Reg. 15263 (Mar. 27, 2017). That would indicate that SSR 06-03 governs here. However, ten days later, the SSA issued a correction replacing that sentence with the following: "Effective Date: March 27, 2017." Rescission of Social Security Rulings 96-2p, 96-5p, and 0603p; Correction, 82 Fed. Reg. 16869 (Apr. 6, 2017). The effect of that correction is subject to dispute, with some courts finding that it made no difference and that the Social Security Rulings rescinded are still applicable to claims filed before March 27, 2017. *See, e.g.*, *Fowler v. Kijakazi*, No. 20-cv-258, 2021 WL 3621708, at *3 (W.D. Ky. Aug. 16, 2021); *Stevens v. Comm'r of Soc. Sec. Admin.*, No. 20-cv-11074, 2021 WL 4768648, at *4 (E.D. Mich. Aug. 17, 2021), *report and recommendation adopted*, 2021 WL 4208800 (E.D. Mich. Sept. 16, 2021). Others disagree and find that the rescinded rulings should not be applied to claims adjudicated on or after March 27, 2017, like this one. *See, e.g.*, *Montoya v. Saul*, No. 19-cv-00550, 2020 WL 4932459, at *3 n.6 (D.N.M. Aug. 24, 2020). Because neither party has briefed this question or even cited SSR 06-03, relying instead on 20 C.F.R. § 416.927(f), which clearly applies to claims filed before March 27, 2017, the Court will not address this dispute in the case law further.

"[t]he adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning."  20 C.F.R. § 416.927(f)(2).  The regulations reflect that "[o]pinions from . . . nonmedical sources may reflect the source's judgment about some of the same issues addressed in medical opinions."  *Id.* § 416.927(f)(1).  Therefore, nonmedical opinions are to be considered using the same factors used to evaluate the opinions of medical sources, such as treating physicians, which include, as noted above in Section III.A.2, details of the relationship between the nonmedical source and the claimant, the supportability of the opinion, and the opinion's consistency with the record, 20 C.F.R. § 416.927(c).  *See id.* § 416.927(f)(1).  However, "not every factor for weighing opinion evidence will apply in every case."  *Id.*

Plaintiff's implication that the ALJ did not consider the relationship between Plaintiff and his mother is inaccurate.  The ALJ specifically identified her as Plaintiff's mother and outlined the contents of the function report, which itself clearly noted that she spent fourteen hours per week with Plaintiff.  *See* ECF No. 8-2 at 26; *see also* ECF No. 8-6 at 13.  Also inaccurate is the Commissioner's insistence that the ALJ dismissed the report because "the opinion was merely a relaying of Plaintiff's subjective complaints."  ECF No. 24 at 22.  Nothing in the function report indicates that it was based on a regurgitation of Plaintiff's representations about his symptoms or activities rather than on his mother's own observations.  In any case, the ALJ did not discount the report because it merely relayed Plaintiff's subjective complaints; rather, he offered only that Plaintiff's mother was "not an acceptable medical source" and her assessment was "not based upon objective medical evidence."  ECF No. 8-2 at 27.  And a number of courts have found such explanations deficient because the regulations require an ALJ to consider the opinions of nonmedical

sources, which will never be from an acceptable medical source and will never be based on objective medical evidence. *See, e.g.*, *Steven S. v. Kijakazi*, No. 22-cv-3298, 2023 WL 6465291, at *4 (D. Md. Oct. 3, 2023) ("[T]he ALJ erred by giving 'little weight' to the function report on the basis that Plaintiff's mother is 'not an acceptable medical source.'  Plaintiff's mother need not be such a source to provide relevant testimony.  As stated above, a nonmedical source may properly opine on 'some of the same issues addressed in medical opinions from acceptable medical sources.'" (internal citation omitted) (first quoting the record and then quoting 20 C.F.R. §§ 404.1527(f)(1), 416.927(f)(1))); *Spicer v. Astrue*, No. 08-cv-357, 2010 WL 4176313, at *2 (M.D. Ala. Oct. 18, 2010) (remanding where, among other things, the ALJ gave the opinion of the plaintiff's former supervisor little weight because it was not an appropriate medical opinion because "[t]he problem with [the] stated rationale is that it applies with equal force to every 'lay statement'"); *Lewis v. Astrue*, No. 09-cv-36, 2010 WL 1416143, at *3 (D. Mont. Apr. 2, 2010) (remanding where the ALJ rejected the evidence of the plaintiff's girlfriend because it was not based on objective medical evidence because "[t]he regulations contemplate that her opinions would not be based on such evidence").  However, the Court does not remand on this ground because even if the ALJ's stated reason for discounting Plaintiff's mother's testimony was erroneous—a decision it is unnecessary for the Court to make here—any error may have been harmless. *See, e.g.*, *Melanie A.S. v. Kijakazi*, No. 21-cv-185, 2022 WL 1721196, at *16–17 (D.D.C. 2022) (finding the ALJ's discounting of the claimant's mother's testimony harmless where that testimony "contained no unique information" and "was undermined by the same substantial record evidence that led the ALJ to discount [the

claimant's] own testimony").  Nevertheless, on remand, the ALJ should reevaluate this function report.

### 2.     Hypotheticals Posed to the VE

Plaintiff first argues that the ALJ's hypotheticals, which posited an individual who could perform simple, routine, and repetitive tasks, "failed to account for [Plaintiff's] limitations in maintaining concentration, persistence, and pace."  ECF No. 22 at 25.  This Court has repeatedly found that a bare restriction to simple, routine, and repetitive tasks does not, without more, account for a moderate limitation in concentration, persistence, and pace, because such a limitation "says nothing about whether the individual can do so on a sustained basis." *Yamise R. v. Kijakazi*, No. 21-cv-3059, 2023 WL 7074088, at *11 (D.D.C. Oct. 25, 2023) (quoting *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019)).  The Commissioner asserts that "[i]n a 2017 regulatory update, the [SSA] clarified that a 'moderate' rating means that the individual has a 'fair' ability to sustain concentration, persistence, or pace 'independently, appropriately, effectively' and 'on a sustained basis.'" ECF No. 24 at 25 (quoting 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.00.F.2).  He maintains that update undermines those cases because, "by definition," a moderate rating denotes that a plaintiff has the capability to concentrate, persist, and maintain pace "on a sustained basis."  *Id.*  But the Commissioner does not address the fact that the regulatory update pre-dates many of the ALJ decisions under review in cases that have found the limitation to simple, routine, repetitive tasks insufficiently accounts for moderate limitations in concentration, persistence, and pace; *Yamise R.* even comments on the updated regulation.  *See Yamise R.*, 2023 WL 7074088, at *10 ("Though the SSA regulations do not define 'fair,' as this Court has previously explained, 'a moderate limitation in maintaining concentration, persistence, or pace "necessarily establish[es] some deficit in [the claimant's] ability to sustain focused attention and concentration long enough to permit the

timely and appropriate completion of tasks commonly found in work settings."'" (alterations in original) (quoting *Nsiah v. Saul*, No. 19-cv-42, 2020 WL 12948519, at *14 (D.D.C. May 12, 2020))).  At this time, then, the Court will hew to its prior decisions to find that the ALJ's finding that Plaintiff was restricted to "simple, routine, and repetitive tasks," ECF No. 8-2 at 22, did not, on its own, adequately account for Plaintiff's moderate limitation in concentration, persistence, and pace.  However, the error might be harmless; Plaintiff makes no argument on that point.  *See Nsiah*, 2020 WL 12948519, at *15 ("[F]ailing to account for moderate limitations in maintaining concentration, persistence, or pace, or to explain why those limitations do not affect the claimant's ability to sustain simple, routine, unskilled work 'is generally considered harmless' if the medical evidence itself establishes that the claimant is capable of completing such tasks despite that limitation." (quoting *Davis v. Berryhill*, 272 F. Supp. 3d 154, 172 (D.D.C. 2017))).  Therefore, the Court does not remand on this ground, but suggests that the ALJ reevaluate how Plaintiff's limitations in concentration, persistence, and pace should be accounted for in his RFC given case law from this District addressing that issue.

Plaintiff's next argument, which addresses Plaintiff's physical limitations, is meritless.  In his opening brief, Plaintiff asserts that "the ALJ failed to account for [Plaintiff's] physical limitations in the hypotheticals posed to the VE."  ECF No. 22 at 25.  Specifically, he alleges that, although the ALJ found that Plaintiff had "more restrictive postural limitations" than those assessed by the State agency consultants, the ALJ "did not incorporate any of these unspecified postural limitations into . . . the hypothetical question posed to the VE, which notes a limitation to occasionally climbing ladders but no limitations in postural functions like bending, reaching, stooping, or kneeling."  *Id.* at 25–26 (quoting ECF No. 8-2 at 25).  Then, in his reply brief, Plaintiff appears to assert that the ALJ found that Plaintiff *could not* occasionally climb ladders and that

therefore the ALJ's question to the VE positing an individual who could occasionally climb ladders was not based on the RFC formulated:

> The ALJ asked the VE to name occupations available to someone who can occasionally climb ladders; perform simple, routine, and repetitive tasks; and interact with co-workers and the public on an occasional basis.  [ECF No. 8-2 at 53].  However, the ALJ's own decision found that [Plaintiff] lacks these mental and physical abilities.  [*Id.* at 22] ("claimant has the [RFC] to perform light work . . . *except* occasionally climb ladders; able to perform simple, routine, and repetitive tasks; occasionally interact with co-workers and the public") (emphasis added). The contradiction is self-evident.

ECF No. 26 at 24 (ellipses in original).

The second contention simply misunderstands the ALJ's opinion.  To be sure, the syntax of the sentence in which the ALJ expresses the RFC is amenable to the interpretation Plaintiff suggests—that is, to state that, although Plaintiff can perform light work, he *cannot* occasionally climb ladders (which presumably would mean he could "rarely" climb ladders).[27]  However, it is clear from context that the ALJ determined that Plaintiff *could* occasionally climb ladders; that modification was an additional limitation on Plaintiff's capabilities.

The first contention seems not to comprehend the restriction to only occasionally climbing ladders *is* a postural restriction.  *See* SSR 96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996) (noting that a "restriction[] related to such activities as climbing ladders" is a "[p]ostural limitation").  To the extent that Plaintiff claims error because the ALJ did not impose "limitations in [other] postural functions like bending, reaching, stooping, or kneeling," the argument fails because he has not identified any evidence in the record that would support such limitations.  ECF No. 22 at 26.  Plaintiff has therefore not shown that there was any error in the ALJ's formulation of the RFC or hypotheticals based on Plaintiff's physical limitations.

---

[27] The SSA describes the frequency with which an individual can perform an action on a five-level scale: never, rarely, occasionally, frequently, and continuously.  *See, e.g.*, *Hernando P. v. Comm'r of Soc Sec.*, No. 20-cv-875, 2021 WL 4059869, at *6 n.3 (C.D. Cal. Sept. 3, 2021).

### IV.    CONCLUSION

For the foregoing reasons, the Court will enter an order **GRANTING** Plaintiff's motion for judgment of reversal to the extent that it seeks remand to the SSA for further administrative proceedings and **DENYING** Defendant's motion for judgment of affirmance.


Date:  March 12, 2024                                    _____

                                                              G. MICHAEL HARVEY
                                                              UNITED STATES MAGISTRATE JUDGE